IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| EVAN COOPER, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Civil Action no.: 25-1479 |
| DEPARTMENT OF THE NAVY, | ) ) ) |
| and | ) ) |
| JOHN PHELAN, In his official capacity as Secretary of the Navy, 720 Kennon St., SE, Bldg 36, Room 233 Washington Navy Yard, DC 20374-5013 | ) JURY TRIAL DEMANDED ) ) ) ) ) |
| Defendants. | ) ) |

**COMPLAINT**

Evan Cooper ("Cooper", "CDR Cooper", or "Plaintiff") by and through his undersigned counsel, according to his knowledge as to his actions and upon information and belief as to the actions of others, hereby files this Complaint and alleges as follows:

**SUMMARY OF THE ACTION**

1. This action arises out of the nonjudicial punishment ("NJP or "Mast") that Plaintiff received while stationed at the Naval Operational Support Center ("NOSC") at Pearl Harbor, HI, for larceny, wrongful appropriation, and fraud, ultimately resulting in his improper reduction from the rank of Commander (paygrade O-5) to Lieutenant (paygrade O-3) for purposes of his retirement pay. The alleged offenses stemmed from a misunderstanding regarding Plaintiff's use of taxis while on Temporary Additional Duty ("TAD") in San Diego where he was being treated at Balboa Naval Hospital for unilateral hearing loss suspected of being caused by a brain tumor.

2.　　Plaintiff appealed to the Board for Correction of Naval Records ("BCNR" or the "Board") seeking correction of his loss of rank in his naval records.

3.　　The Board, ignoring important facts surrounding the non-judicial punishment that should have resulted in the punitive actions being overturned, denied Plaintiff's appeal.

4.　　The Board's decision, however, was arbitrary and capricious and not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A).

5.　　The injustice of the non-judicial punishment and the BCNR decisions have negatively impacted Plaintiff's retirement pay, enshrining his reduction to the rank of Lieutenant (paygrade O-3) for his retirement.

6.　　Having exhausted his administrative remedies under 10 U.S.C. § 1552, Plaintiff now brings this suit (the "Action") against John Phelan, in his official capacity as Secretary of the Navy, Department of The Navy, ("Defendant" or the "Navy") pursuant to 5 U.S.C. § 706(2) to seek relief from the Board's decision, which violated the Administrative Procedures Act.

## PARTIES

7.　　Plaintiff, Evan Cooper: At times relevant to the Complaint, Plaintiff Evan Cooper served for 22 years in the Navy (active and reserve time), completing his service as a Commander (O-5).

8.　　Defendant, John Phelan is the Secretary of the Navy, of the Department of the Navy, of which the Board of Correction of Naval Records ("BCNR") is the Secretary of the Navy's highest Board for final adjudication/review under 10 U.S.C. § 1552. Pursuant to 5 U.S.C. § 702, Phelan is required to be a named party defendant. It is not believed at this time that Phelan has any personal knowledge of, or engaged in, any error or injustice toward the Plaintiff. The true actors

2

that committed the injustice and error, as currently known to the Plaintiff, are employees of the Navy, who preside over the BCNR.

## JURISDICTION AND VENUE

9. Jurisdiction: This Court has jurisdiction under 28 U.S.C. §1331. Federal question jurisdiction gives district courts original jurisdiction over civil actions arising under the Constitution, laws, or treaties of the United States.

10. Jurisdiction is also appropriate because the defendant is a federal agency under 5 U.S.C. § 701(b)(1).

11. The BCNR's decision is a reviewable final agency decision under the Administrative Procedure Act (APA), 5 U.S.C. § 704.

12. Under 5 U.S.C. § 706(2), the Court may hold unlawful and set aside BCNR's final decisions.

13. This Court has personal jurisdiction over the parties pursuant to 10 U.S.C. § 533.

14. Venue is proper because at all times relevant to the claims herein, the BCNR was located at 701 S. Courthouse Road, Suite 1001, Arlington, Virginia, 22204-2490. Accordingly, venue is proper in the Eastern District of Virginia pursuant to 28 U.S.C. 1391(e) because the Defendant is an officer or employee of the United States and a substantial part of the events or omissions giving rise to the claim occurred in this District.

## ADMINISTRATIVE EXHAUSTION

15. Plaintiff made initial contact with the BCNR on or about January 6, 2014, by appealing his retirement paygrade of O-3. This appeal was denied. *See, generally,* Ex. A.

16. On or about July 16, 2019, Plaintiff appealed to the Board for reconsideration. This appeal was also denied. *See, generally*, Ex. B.

17. On or about December 7, 2022, Plaintiff, through undersigned counsel, filed an appeal with the BCNR of the Board's improper decision to uphold violations of time-honored military customs instead of correcting Plaintiff's retirement paygrade. *See generally*, *id*.

18. On or about September 11, 2023, the BCNR issued a letter decision denying Plaintiff's requested relief on the merits. *See* Ex. C.

19. The Board's September 11, 2023, letter did not address Plaintiff's argument that the non-judicial punishment on which his reduction in retirement rank was based was incurably flawed due, in part, to the fact that the Executive Officer's Inquiry ("XOI") into Plaintiff's conduct was performed by an officer junior to Plaintiff. *See, generally*, *id.*

## FACTS

20. This action arises out of the nonjudicial punishment ("NJP or "Mast") that Plaintiff received while stationed at the Naval Operational Support Center ("NOSC") at Pearl Harbor, HI, for larceny, wrongful appropriation, and fraud, resulting in his improper reduction from the rank of Commander (paygrade O-5) to Lieutenant (paygrade O-3) for purposes of his retirement pay. The alleged offenses stemmed from a misunderstanding regarding Plaintiff's use of taxis while on Temporary Additional Duty ("TAD") in San Diego where he was being treated at Balboa Naval Hospital for unilateral hearing loss suspected of being caused by a brain tumor.

**A. Plaintiff's non-judicial punishment, imposed by an officer of the same rank, violated time-honored Naval/Military custom.**

21. Nonjudicial punishment is authorized by 10 U.S.C. § 815.

22. At the time of the non-judicial punishment, CDR Cooper was an O-5 Commander in paygrade.

23. The non-judicial punishment against him was conducted by another O-5, the same rank and paygrade as CDR Cooper.

24. Non-judicial punishment is a disciplinary procedure that can affect career opportunities and retirement pay for service members.

25. Officers handling non-judicial punishments consider evidence and determine whether an alleged offense has been committed.

26. Non-judicial punishment is intended for minor offenses normally committed by enlisted personnel.

27. If an officer receives non-judicial punishment, and is found guilty of any offense, that officer has no further promotion potential and his career is basically over.

28. Accordingly, it is a custom of the service that punishment by non-judicial punishment will not be handled by an individual junior to, or the same rank as, the accused.

29. This custom is an extension of both the Manual for Courts Marital (MCM) and Uniform Code of Military Justice's (UCMJ) emphasis that integrity of military justice requires respecting the chain of command.

30. Both sources of authority demand that punishment authority rests with those in a position of clear command, and therefore by nature excludes peers or subordinates.

31. The MCM forbids, for example, a convening authority "junior in rank to an accuser" from convening a court martial for the accused "unless that convening authority is superior in command to the accuser." Rule 504(c)(2).

32. For the same reason, members of the court martial may be removed if they are "junior to the accused in grade or rank," unless there is an exigency. Rule 912(k).

33. Because of this well-established custom, those who do not otherwise have primary command authority over other military personnel may only exercise the commander's powers

when authorized by regulations and when directly delegated commander's powers under Article 15. MCM, Part V, 2(c).

34. Similarly, the customary heeding of command structure is articulated in the UCMJ, which states that members sitting in judgment of an accused at court-martial will not be junior to that person. 10 U.S.C. § 825(e)(1).

35. Courts have acknowledged this custom, finding, for example, that a junior officer, even one who is licensed attorney, should not be appointed to investigate charges against senior officer, as doing so, constitutes "a gross breach of military protocol and courtesy." *See U.S. v. Reynolds*, CMA 1987, 24 M.J. 261, 263 (CMA 1987).

36. Even in the rare event that a high-ranking officer is the subject of such proceedings, such as the recent court-martial of a two-star Air Force Major General, where the accused's seniority makes constituting a court of higher-ranking officers a challenge, the service will bring in members senior to the accused in date of rank to ensure due compliance with command structure.

37. Such customs of the service form the foundation of military justice. They define the "duties" of service members under 10 U.S.C. § 892, and as such are given the force of law. *See United States v. Free*, 14 C.M.R. 466, 469, 1953 WL 2781 (1953) (finding that when "there is a custom in the military service" that is "long standing and well recognized" its breach constitutes an offense and that the "regard for authority by juniors towards their seniors which experience has shown is enhanced by the observance of decorum, tradition, custom, usage, and conventions," constitutes one such custom which is "peculiar to the services alone.")

38. Accordingly, military members may be court-martialed for violating customs of the service, such as violations of wearing the uniform incorrectly.

39. The custom of the service determines the obligations of military members; therefore, it should also determine their rights.

40. Rules prohibiting officers from imposing discipline on officers of the same rank are especially important. They exist, in part, to prevent officers from eliminating those more senior on the lineal list that denotes every officer in the service by seniority in order, thus avoiding or defeating some of the competition on their next promotion board.

41. Non-judicial punishments of officers such as CDR Cooper are typically handled by the first flag officer (in the Navy's case, an admiral) in the chain of command.

42. However, the Commanding Officer ("CO") here, CDR Davis, conducted the non-judicial punishment despite being an O-5 like CDR Cooper.

43. The non-judicial punishment was in contravention of time-honored naval custom.

44. The Navy failed to provide an officer in the grade of O-6 or higher to handle the non-judicial punishment, despite having numerous officers available at Pearl Harbor, the large Navy base where CDR Cooper's non-judicial punishment was held.

45. When conducting non-judicial punishments there may be a sense of urgency, but only in cases involving deployment at sea or being engaged in combat. *See* 10 U.S.C. § 815(a).

46. Neither of the exigent circumstances justified an O-5 conducting the non-judicial punishment in this case.

47. The Navy knew that CDR Cooper's unit, Naval Operational Support Center (NOSC), Pearl Harbor, HI, (in essence, a nondeployable administrative unit) is responsible for the readiness of Selected Reserve Sailors which provide operational capabilities to their supported (active-duty) commands fleetwide.

48. Although the unit would not deploy or otherwise relocate, the Navy failed to provide any justification for the urgency in rushing the non-judicial punishment against CDR Cooper.

49. The orders used to bring CDR Cooper to the non-judicial punishment were highly irregular.

50. CDR Cooper was ordered from his home in Baton Rouge, Louisiana, to Pearl Harbor, Hawaii.

51. CDR Cooper was placed on active duty to stand for an Executive Officer Investigation ("XOI") and then proceeded directly to a Captain's Mast/ non-judicial punishment on Wednesday, May 28, 2008.

52. Both the XOI and the non-judicial punishment were rushed through on the very same day.

53. For an officer non-judicial punishment, this is virtually unheard of.

54. The very next day, CDR Cooper was taken back off active duty, placed in reserve status, and sent back to Louisiana.

55. These procedures did not comport with basic fairness, nor with normal naval justice policies.

56. Although the Judge Advocate General's School recognizes that commanders may grant waivers in appropriate cases, it cautions that "[a] Reserve member generally cannot be involuntarily ordered to a duty status solely for purposes of initiating or completing non-judicial punishment actions". Judge Advocate Gen. Sch., The Military Commander and the Law, 56 (2016).

57. It was the duty of the Commanding Officer ("CO") to ensure that proper administrative procedures were followed, adequate counsel provided, and enough time scheduled to allow a full review of the facts. *See* Judge Advocate Gen. Sch., Commander's Legal Handbook, 7 (2019) (Commanders are responsible for… protecting Soldiers' rights").

58. But the CO here, CDR Davis, packed the entire disciplinary action—from investigation to Mast—into a few hours in one afternoon.

59. Two of the most senior officers in the naval legal community have attested to the irregularity of this non-judicial punishment. Their statements highlight two of the errors committed here.

60. First, the Navy violated time-honored military customs by allowing the non-judicial punishment to be handled by an officer of the same rank as CDR Cooper.

61. Second, the Board erred by failing to remedy the Navy's actions and correcting this injustice.

62. CDR Cooper produced a letter from a former Judge Advocate General of the Navy, James E. McPherson, JACG, USN (Ret.) to the Board.

63. Admiral McPherson noted that a commander conducting a non-judicial punishment should be senior to the person being punished, and in the case of officers, the norm is for the non-judicial punishment to be heard by the first flag or general officer in the chain of command.

64. Additionally, Admiral McPherson stated that "[i]n my 30 years of military service as a uniformed officer and as a civilian working in the Pentagon in senior roles, I have never encountered a situation where an officer of the same rank, regardless of his or her position, imposed NJP on an officer of that rank." *See* Ex. D.

65. Admiral McPherson views the Navy's actions as "highly irregular" and as something that "should be prohibited." *Id.*

66. Major General Ewers, USMC (Ret.), a recently retired senior lawyer who served as Staff Judge Advocate to the Commandant of the Marine Corps, similarly wrote that ". . . the imposition of NJP on an officer of the Naval service by another officer of the same rank is, absent some compelling basis for an exception, highly inappropriate." Indeed, in General Ewers' 34 years of service, he ". . . never heard of an officer imposing NJP on another officer of the same grade." *See* Ex. E.

67. Major General Ewers further stated that had he been advised of such a contemplated action, ". . . he would have stepped in and immediately provided a strong recommendation against the idea, again absent a compelling basis for doing it." *Id*.

68. The Navy had no compelling basis for the actions taken against CDR Cooper.

69. Regarding the Marine Corps, which shares an obvious common heritage with the Navy, Major General Ewers notes that "…every officer NJP in the Marine Corps is imposed by a general or flag officer." He states further that "[m]ost general and flag officers thus withhold their officer NJP authority because they have a Staff Judge Advocate ["SJA"] advising them on the merits, and ensuring that the proceeding is conducted properly and the rights of the accused are protected. As another safeguard, in most cases, the SJA ensures that a court reporter is present to prepare a verbatim transcript of the proceedings." *Id*.

70. The Navy's guiding document is the Manual of the Judge Advocate General of the Navy (JAGMAN).

71. Paragraph 0206 states: "Whenever practical, an investigating officer should be senior in rank to any individual whose conduct is subject to inquiry. *See* JAG INSTRUCTION

5800.7G "MANUAL OF THE JUDGE ADVOCATE GENERAL" December 2023, *available at* https://stjececmsdusgva001.blob.core.usgovcloudapi.net/public/documents/JAGINST_5800.7G_CH-2_1.pdf.

72.  This provision has been enshrined in the JAGMAN for many years.

73.  It was used in the 2007 JAGMAN which controlled CDR Cooper's non-judicial punishment. *See* JAG INSTRUCTION 5800.7E "MANUAL OF THE JUDGE ADVOCATE GENERAL" June 2007.

74.  Furthermore, JAGMAN Paragraph 0106(g), addressing the withholding of nonjudicial punishment authority, states:

75.  Though no commander may direct that a subordinate impose non-judicial punishment in a particular case, a superior commander may limit or withhold the exercise by subordinate commanders of any disciplinary authority they might otherwise have under Part V, MCM. Such limitations could be for certain types of offenses or certain categories of persons, in specific cases, or limits on imposition of certain types of punishment. JAG INSTRUCTION 5800.7G "MANUAL OF THE JUDGE ADVOCATE GENERAL" December 2023, *available at* https://www.secnav.navy.mil/doni/SECNAV%20Manuals1/5800.7G_CH-2.pdf.

76.  As confirmed by the JAGMAN, Admiral McPherson, and Major General Ewers, all flag officers typically reserve officer non-judicial punishment to themselves, and there is no indication here that CDR Davis even consulted any flag officers about this matter outside his own command.

77.  Similarly, there is typically a Judge Advocate present at an officer non-judicial punishment while not one attorney was present here.

78. The disregard for customary protocol is made even worse by the fact that CDR Cooper received no legal advice prior to his non-judicial punishment, a benefit that he should have been accorded.

79. CDR Cooper specifically requested such legal advice and was denied by another O-5.

80. While the JAGMAN notes that there is no right to a military lawyer for non-judicial punishment, this is normally overlooked and counsel is provided anyway, due to the adverse career implications of non-judicial punishment for officers.

81. Admiral McPherson noted his shock at this denial, stating, "I am stunned that an O-5 would deny another O-5 some minimal legal consultation prior to a potentially career ending event. That is yet another aspect of this case that is most concerning and inappropriate." Ex. D.

82. General Ewers likewise pointed out that "[i]n the case of a relatively senior officer receiving non-judicial punishment, the failure to provide the opportunity to obtain legal advice is a red flag that severely compromises the validity of the NJP and contributes to the appearance of impropriety." He concluded by noting that the non-judicial punishment is therefore "highly suspect" and he "…strongly recommend[s] that the punishment be set aside in the interests of justice." Ex. E.

83. The BCNR had the opportunity to verify CDR Cooper's claims that his non-judicial punishment was conducted in violation of time-honored military custom.

84. The Navy Personnel Command ("BUPERS") collects and maintains records of all officer misconduct.

85. Had the BCNR asked, BUPERS would have provided it for review, and BCNR could have identified all instances where an officer was punished by personnel of equal or lesser rank.

86. Yet the BCNR failed to take this simple action, despite ample indication that CDR Cooper's non-judicial punishment was procedurally unprecedented and against naval custom.

87. The Board incomprehensibly deemed this violation of time-honored custom insufficient to support CDR Cooper's appeal, despite the non-judicial punishment's highly irregular procedures, flouting of military custom, and disrespect for CDR Cooper's rights.

88. The Board's decision essentially means that a commanding officer in the grade of O-3 (a Navy lieutenant or Marine Corps captain) could impose non-judicial punishment on a senior officer attached to that command even if the officer attached were in the grade of O-5 or O-6. One need only consider this for a second to see how absurd it is, yet this is the entire basis for the BCNR's decision.

    **B.    The Executive Officer's Investigation ("XOI"), performed by an officer junior to Plaintiff prior to his non-judicial punishment, violated time-honored Naval/Military custom.**

89. At the time of the non-judicial punishment, CDR Cooper was an O-5 officer in paygrade.

90. The investigation and XOI concerning him were conducted by a lieutenant commander, a rank and paygrade junior to CDR Cooper.

91. The investigation and XOI are a critical stage preceding the non-judicial punishment.

92. Officers leading this investigation collect evidence to determine which, if any, charges should be brought against an accused.

93. Accordingly, it is a custom of the service that the investigation (XOI) will not be handled by an individual junior to, or the same rank as, the accused, a fully observed custom.

94. Such customs of the service form the foundation of military justice. They define the "duties" of service members under 10 U.S.C. § 892, and as such are given the force of law. Military members may be court-martialed for violating customs of the service.

95. The custom of the service determines the obligations of military members; therefore, it should also determine their rights.

96. The customary heeding of command structure is articulated in the Uniform Code of Military Justice (UCMJ), which states that members sitting in judgment of an accused will not be junior to that person. 10 U.S.C. § 825(e)(1).

97. Investigations in units are often conducted by the unit Executive Officer ("XO") as an XOI.

98. However, the XO of the unit in which CDR Cooper was serving at the time was an O-4.

99. His investigation of CDR Cooper was in contravention of time-honored custom.

100. The XO's involvement was especially inappropriate given the fact that he was in CDR Cooper's direct line of command.

101. The Navy failed to provide a suitable officer in the grade of O-6 or higher to perform the investigation, despite having numerous officers available at Pearl Harbor, the large Navy base where CDR Cooper's XOI and non-judicial punishment hearing were heard.

102. There were no exigent circumstances justifying the junior O-4's appointment.

103. When conducting investigations there may be a sense of urgency, but only in cases involving deployment at sea or being engaged in combat, neither of which applies here. *See* 10 U.S.C. § 815(a).

104. The Navy knew that CDR Cooper's unit, Naval Operational Support Center (NOSC), Pearl Harbor, HI, is responsible for the readiness of Selected Reserve Sailors which provide operational capabilities to their supported (active-duty) commands fleetwide.

105. The unit is, in essence, a nondeployable administrative unit. Yet the Navy failed to provide any justification for the urgency in rushing the investigation against CDR Cooper.

106. The BCNR had the opportunity to verify CDR Cooper's claims.

107. The Navy Personnel Command (BUPERS) collects and maintains records of all officer misconduct.

108. Had the BCNR asked, BUPERS would have provided it for review, and BCNR could have identified all instances where an XO investigated a superior officer.

109. Yet the BCNR failed to take this simple action, despite ample indication that CDR Cooper's non-judicial punishment was procedurally unprecedented and against naval custom.

110. The disregard for customary protocol described herein is made even worse by the apparent command influence in this case. The investigating XO was junior to the CO of the NOSC, and a direct subordinate of the CO.

111. The instruction to hold an XOI had to come from the CO of the NOSC, the same officer who had signed the XO's FITREP (performance evaluation). The XO may have had his finding at the XOI tainted by the result that he perceived the CO wanted, or worse, that the CO insisted on. We will never know.

112. Despite the irregular, unjustified, and unquestionable departure from time-honored custom, the Board apparently failed to consider the issue at all. *Compare* Appeal, Ex. B, at 3-4, with Decision Letter, Ex. C (no mention of XOI).

113. From start to finish, CDR Cooper's rights were not protected.

114. His non-judicial punishment was investigated, rushed, and assembled slapdash in direct contravention of time-honored custom. CDR Cooper did not even receive legal counsel prior to the non-judicial punishment nor prior to waiving a Board of Inquiry; instead, Plaintiff relied on the command's assurances that he would retire as an O-5 if he waived the BOI. These assurances are uncontested.

115. In fact, CDR Cooper's retirement packet recommended retirement in the paygrade O-5. Yet contrary to this recommendation and the command's promises, CDR Cooper was administratively reduced from Commander (paygrade O-5) to Lieutenant (paygrade O-3).

116. Even a court-martial cannot reduce an officer in grade. Yet the upshot of this non-judicial punishment was to ultimately impose, albeit administratively, a harsher punishment than a court-martial would have imposed.

117. Due to these procedural defects, CDR Cooper retired at a rank and paygrade lower than that which he earned and deserved, suffering a substantial blow to his reputation and finances.

118. Furthermore, as a reservist, CDR Cooper was forced to accept the results of the non-judicial punishment at his own expense. Active-duty personnel would have been afforded a paycheck while the process proceeded to the following outcomes.

119. Now the Board has compounded the mistreatment Plaintiff has endured in its refusal to give proper weight, or even consider, the violation of custom that underlies the retirement rank reduction at the heart of his appeal.

**COUNT I**
**VIOLATION OF THE ADMINISTRATIVE PROCEDURES ACT (5 U.S.C. §706(2)(A))**

120. Plaintiff incorporates all prior paragraphs.

121. The BCNR's finding is a final agency decision subject to APA review. *See Chappell v. Wallace*, 462 U.S. 296, 303 (1983) ("Board decisions are subject to judicial review and can be set aside if they are arbitrary, capricious or not based on substantial evidence").

122. The BCNR's finding that CDR Cooper's naval records do not include material error and injustice is arbitrary, capricious, not in accordance with law and constitutes an abuse of discretion. §706(2)(A).

123. A decision is arbitrary and capricious when it was not "based on a consideration of relevant factors" and when there is a "clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

124. Courts must be able to find a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962).

125. The APA's protections are especially important when it comes to the BCNR, because the Board has a "statutory mandate to correct records when 'necessary to correct an error or remove an injustice'". *Kelly v. United States*, 69 F.4th 887, 899 (Fed. Cir. 2023) (citing 10 U.S.C. § 1552(a)(1)).

126. The BCNR's refusal to reinstate CDR Cooper to his O-5 paygrade was a clear error of judgment.

127. Moreover, this decision (1) relies on the Board's improper downplaying of the violations of custom inherent in Plaintiff's non-judicial punishment, (2) suffers from the Board's failure to reference the Navy's own records regarding non-judicial punishment s to assess whether the procedure followed here contradicted customs and practice, and (3) fails to even consider the

violation of customs involved in the tainted XOI, all of which demonstrate an irrational failure to consider relevant factors and render the decision arbitrary and capricious. *See Pettiford v. Sec'y of the Navy*, 774 F. Supp. 2d 173 (D.D.C. 2011) (finding that the Board's failure to address a non-frivolous argument raised by an officer that could affect the Board's ultimate disposition of his claim rendered the Board's decision arbitrary).

128. Therefore, the Board's decision is both arbitrary and capricious within the meaning of 5 U.S.C. § 706(A).

129. The Board's decision also violates 5 U.S.C. § 706(A) because it is not "in accordance with law."

130. Correction boards, including the BCNR, are empowered to remove an injustice from service members' military records. 10 U.S.C. § 1552(a).

131. The Board's denial of Plaintiff's appeal directly contravenes its statutory mandate to cure clear injustices. This decision, despite the blatant violations of time-honored custom employed in the non-judicial punishment and XOI, shows a complete disregard for the rights of military personnel.

132. When the BCNR fails to correct an injustice clearly presented in the record before it, it is acting in violation of its statutory mandate under 10 U.S.C. § 1552(a). *Yee v. United States*, 512 F.2d 1383, 1387 (Ct. Cl. 1975).

133. The BCNR's failure to correct the injustice clearly presented in CDR Cooper's records as required by 10 U.S.C. § 1552(a) violated the APA because it rendered the decision as one not in accordance with that law.

134. Therefore, the Board's decision is not in accordance with law and arbitrary and capricious within the meaning of 5 U.S.C. § 706.

135. The BCNR's decision must be set aside under the Administrative Procedures Act.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury for all claims herein.

## PRAYER FOR RELIEF

CDR Cooper respectfully requests that this court enter an order finding that the Board's denial of CDR Cooper's appeal violated the Administrative Procedures Act, vacate the Board's decision, and remand the matter back to Board with instructions to:

1. Disapprove of Plaintiff's non-judicial punishment;

2. Reinstate Plaintiff to his earned rank of Commander (paygrade O-5);

3. Retire Plaintiff at that rank with backpay to the date that he was reduced to Lieutenant (paygrade O-3);

4. Award Plaintiff all attorneys' fees and costs incurred in connection with this action and the underlying administrative action; and

5. Plaintiff respectfully requests such and other relief as the Court deems just and proper under the circumstances.

Dated: September 5, 2025                    Respectfully submitted,

*/s/ David S. Jonas*
David S. Jonas, VSB No. 94272
Kia Rahnama, VSB No. 93718
**Fluet**
1751 Pinnacle Drive, Suite 1000
Tysons, VA 22102
T: (703) 590-1234
F: (703) 590-0366
djonas@fluet.law
krahnama@fluet.law
e-file@fluet.law

*Counsel for Plaintiff*